Timothy W. Brown
**THE BROWN LAW FIRM, P.C.**
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Adam Bernstein, SBN 13298
**LAW OFFICE OF ADAM R. BERNSTEIN**
198 Coffeeberry Dr.
San Jose, CA, 95123
Telephone: (408) 960-6511
Facsimile: (408) 613-2489
Email: bernsteinlaw@earthlink.net

*Liaison Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY CSOKA, DERIVATIVELY AND ON BEHALF OF XOMA CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN W.VARIAN, PAUL D. RUBIN, PATRICK J. SCANNON, WILLIAM K. BOWES JR., PETER BARTON HUTT, JOSEPH M. LIMBER, W. DENMAN VAN NESS, TIMOTHY P. WILBERT, and JACK L. WYSZOMIERSKI,<br><br>Defendants,<br><br>And<br><br>XOMA CORPORATION,<br><br>Nominal Defendant. | CASE No.:<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:<br><br>(1) BREACH OF FIDUCIARY DUTY;<br>(2) CORPORATE WASTE;<br>(3) GROSS MISMANAGEMENT; AND<br>(4) UNJUST ENRICHMENT<br><br>**JURY TRIAL DEMANDED** |

1
Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Jeffrey Csoka ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant XOMA Corporation ("XOMA," or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants John W. Varian, Paul D. Rubin, Patrick J. Scannon, William K. Bowes Jr., Peter Barton Hutt, Joseph M. Limber, W. Denman Van Ness, Timothy P. Walbert, and Jack L. Wyszomierski (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of XOMA, gross mismanagement, abuse of control, and unjust enrichment for her complaint against Individual Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding XOMA, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action which seeks to remedy the Individual Defendants' breaches of fiduciary duties and other violations of the law that occurred from November 6, 2014 through the present (the "Relevant Period").

2.     XOMA is a biopharmaceutical company primarily focused on the development of innovative antibody-based therapeutics.  XOMA's lead product candidate is gevokizumab, "a proprietary potent, humanized allosteric-modulating monoclonal antibody that binds to the inflammatory cytokine interleukin-1 beta ("IL-1 beta").  XOMA publicly stated its belief that gevokizumab "has the potential to address the underlying inflammatory causes of a wide range of diseases [ ] identified as having unmet medical needs."

3.     XOMA developed gevokizumab to treat Behçet's disease uveitis, a multisystem inflammatory disorder most commonly involving eyesight, which could lead to blindness.

4.     XOMA commenced three clinical trials to assess gevokizumab for treatment of non-infectious, intermediate, posterior or pan-uveitis ("NIU") and Behçet's disease uveitis.  The Phase 3 EYEGUARD-B for the study of patients with Behçet's disease uveitis outside the United States is one among the three trials.

5.     Since November 6, 2014, the Company has made public material misrepresentations and omissions with respect to the imminent commercial viability of gevokizumab, leading investors to conclude that the Phase 3

EYEGUARD-B study would be successful and that approval from the United States Food and Drug Administration ("FDA") would be sought.

6.      On July 22, 2015, however, XOMA revealed that the EYEGUARD-B trial failed its objective of gevokizumab as treatment for Behçet's disease uveitis and therefore could not support a prebiologics licensing application ("BLA") to the FDA.  As a result of this revelation, the Company's stock plummeted more than 77%, eradicating more than $400 million in market capitalization.  XOMA's stock fell below $1 per share, subjecting the Company to delisting on the NASDAQ.

7.      The Company's public misrepresentations regarding the viability of gevokizumab had further exposed it and defendants John W. Varian and Paul D. Rubin to liability under federal securities laws, as a federal securities class action complaint has been filed in this Court on behalf of investors of XOMA shares.  In light of Defendants' conduct, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

8.      The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

9.      Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## **PARTIES**

12.     Plaintiff is a current shareholder of XOMA.  Plaintiff has been a shareholder of XOMA common stock since before the beginning of the Relevant Period, and he has continuously held XOMA common stock throughout the Relevant Period.  Plaintiff is a citizen of New York.

13.     Defendant XOMA is a biopharmaceutical research and development company.   XOMA is a Delaware Corporation headquartered in Berkeley, California.   The Company's stock has traded on the NASDAQ Global Market ("NASDAQ") under ticker "XOMA."

14.     Defendant John W. Varian ("Varian") was appointed Interim CEO on August 31, 2011, then CEO in January 2012.  He has served as director of XOMA

since 2008.   Upon information and belief, defendant Varian is a citizen of California.   On November 13, 2014, defendant Varian sold 2,630 shares of Company stock at $3.89 per share, a value of $10,239.70.   On December 15, 2014, defendant Varian sold 10,000 shares at $4.49 per share, worth $44,900.   On January 15, 2015, defendant Varian sold 10,000 shares of XOMA common stock at $3.46 per share, worth $34,600.   On February 17, 2015, Varian sold 10,000 shares at $3.52 per share, worth $35,200.   On February 26, 2015, Varian sold 10,000 shares at $3.72 per share, a value of $37,200.   On March 18, 2015, defendant Varian disposed of 44,877 shares of Company stock at $4.01 per share, for $179,956.77.   On April 15, 2015, defendant Varian disposed of 10,000 shares at $3.86 per share, netting $38,600.   On May 15, 2015, defendant Varian sold 10,000 shares at $3.34 per share, for $33,400.   On June 15, 2015, defendant Varian disposed of 10,000 shares of Company stock at $3.64 per share, for $36,400.   On July 15, 2015, defendant Varian disposed of 10,000 shares of Company stock at $4.49 per share, for $44,900.   Defendant Varian's total sales for the relevant period netted him $495,396.47.   His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.   According to XOMA's 2015 Proxy Statement filed with the SEC on April 10, 2015 ("Proxy"), as of April 10, 2015, Varian held 1,187,474 shares of Company common stock, and he received $3,039,912 in total compensation (including salary, stock and other awards) from XOMA in 2014.   The

2015 Proxy said the following about Varian:

> *John Varian* was appointed Chief Executive Officer in January 2012 after serving as Interim Chief Executive Officer since August 31, 2011. He has been a director of the Company since December of 2008. He served as Chief Operating Officer of Aryx Therapeutics, a biopharmaceutical company, from December of 2003 to August of 2011 and as its Chief Financial Officer from April of 2006 to March of 2011. Prior to joining Aryx Therapeutics, Mr. Varian was the Chief Financial Officer of Genset S.A., until that company's sale to Serono S.A. in 2002. From October of 1998 to April of 2000, Mr. Varian served as Senior Vice President, Finance and Administration of Elan Pharmaceuticals, Inc., joining the company as part of its acquisition of Neurex Corporation. Prior to the acquisition, he served as Neurex Corporation's Chief Financial Officer from June of 1997 until October of 1998. From 1991 until 1997, Mr. Varian served as the VP Finance and CFO of Anergen Inc. Mr. Varian was an Audit Principal/Senior Manager at Ernst & Young from 1987 until 1991 where he focused on life sciences. He is a founding member of the Bay Area Bioscience Center and a former chairman of the Association of Bioscience Financial Officers International Conference. Mr. Varian received a B.B.A. degree from Western Michigan University. Mr. Varian served on the Board of Nventa Biopharmaceuticals Corporation until the company merged with Akela Pharma Inc. in March of 2009. In 2014, Mr. Varian joined the Board of Directors of Versartis, Inc. Mr. Varian has significant experience in building biopharmaceutical companies and brings a specific focus on financing, corporate financial management and related matters to the Company and Board.

15.     Defendant Paul D. Rubin ("Rubin") is XOMA's Chief Medical Officer and Senior Vice President of Research and Development and has served in these capacities since 2011.  Upon information and belief, defendant Rubin is a citizen of California.   On November 20, 2014, defendant Rubin sold 5,000 shares of Company stock at $4.55 per share, a value of $22,750.  On December 15, 2014, defendant Rubin sold 1,600 shares of Company stock at $4.63 per share, a value of $7,408.   On March 18, 2015, defendant Rubin sold 20,535 shares of Company

stock at $4.01 per share, a value of $82,345.35.   On March 23, 2015, defendant Rubin sold 32,742 shares of Company stock at $3.94 per share, a value of $129,003.48.   On May 28, 2015, defendant Rubin sold 1,788 shares of Company stock at $3.60 per share, a value of $6,436.80.   On July 9, 2015, defendant Rubin sold 4,400 shares of Company stock at $4.55 per share, a value of $20,020.   On July 10, 2015, defendant Rubin sold 29,000 shares of Company stock at $4.55 per share, a value of $131,950.  On July 15, 2015, defendant Rubin sold 5,000 shares of Company stock at $4.60 per share, a value of $23,000.   Defendant Rubin's total sales for the relevant period netted him $422,913.63.   His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.   According to the 2015 Proxy, as of April 10, 2015, Rubin owned 463,129 shares of Company common stock, and he received $1,811,430 in total compensation (including salary, stock and other awards) from XOMA in 2014.   About Rubin, the Proxy stated the following:

> *Paul D. Rubin, M.D.* is the Company's Senior Vice President, Research and Development and Chief Medical Officer. Dr. Rubin joined the Company in June of 2011. Prior to joining XOMA, Dr. Rubin was Chief Medical Officer at Funxional Therapeutics Ltd. He was Chief Executive Officer of Resolvyx Pharmaceuticals, Inc. from 2007 to 2009 and President and Chief Executive Officer of Critical Therapeutics, Inc. from 2002 to 2007. From 1996 to 2002, Dr. Rubin served as Senior Vice President, Development, and later as Executive Vice President, Research & Development at Sepracor. He was responsible for the successful development of all of Sepracor's internally developed approved products including Xopenex®, Lunesta®, Xopenex HFA® and Brovana®. From 1993 to 1996, Dr. Rubin held senior level

positions at Glaxo-Wellcome Pharmaceuticals, most recently as Vice President of Worldwide Clinical Pharmacology and Early Clinical Development. During his tenure with Abbott from 1987 to 1993, Dr. Rubin served as Vice President, Immunology and Endocrinology, where he successfully advanced zilueton, the first 5-lipoxygenase inhibitor, from discovery to approval for the treatment of asthma. Dr. Rubin received a BA from Occidental College and his M.D. from Rush Medical College. He completed his training in internal medicine at the University of Wisconsin.

16.     Defendant Patrick J. Scannon ("Scannon") founded the Company and has served as its director since 1981.  Defendant Scannon also serves as XOMA's Executive Vice President and Chief Scientific Officer since February 2011.  Upon information and belief, defendant Scannon is a citizen of California.  On November 13, 2014, defendant Scannon sold 8,245 shares of Company stock at $3.89 per share, a value of $32,073.05.  On December 1, 2014, defendant Scannon sold 5,000 shares of Company stock at $5.51 per share, a value of $27,550.  On January 2, 2015, defendant Scannon sold 5,000 shares of Company stock at $3.55 per share, a value of $17,750.  On February 2, 2015, Scannon sold 5,000 shares at $3.52 per share, worth $17,600.  On March 18, 2015, Scannon disposed of 8,666 shares of stock at $4.01 per share, worth $34,750.66.  Defendant Scannon's total sales for the relevant period netted him $129,723.71.  Scannon's insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.  According to XOMA's 2015 Proxy, as of April 10, 2015, Scannon held 456,113 shares of Company common stock, and he received $1,132,535 in total compensation

(including salary, stock and other awards) from XOMA in 2014.  The 2015 Proxy said the following about Scannon:

> *Patrick J. Scannon, M.D., Ph.D.* is one of the Company's founders and has served as a director since its formation. Dr. Scannon became Executive Vice President and Chief Scientific Officer in February of 2011. Previously he was Executive Vice President and Chief Medical Officer beginning in March of 2009 and served as Executive Vice President and Chief Biotechnology Officer from May of 2006 until March of 2009, Chief Scientific and Medical Officer from March of 1993 until May of 2006, Senior Vice President from May of 1999 to May of 2006, Vice Chairman, Scientific and Medical Affairs from April of 1992 to March of 1993 and President from the Company's formation until April of 1992. In 2007, Dr. Scannon was invited to join the newly formed National Biodefense Science Board, reporting to the Secretary of the Department of Health and Human Services. He also served on the Defense Sciences Research Council for the Defense Advanced Research Projects Agency and on the Threat Reduction Advisory Committee for the Department of Defense. In 2007, he was appointed to the Board of Directors of Pain Therapeutics, Inc., a biopharmaceutical company. From 1979 until 1981, Dr. Scannon was a clinical research scientist at the Letterman Army Institute of Research in San Francisco. A Board-certified internist, Dr. Scannon holds a Ph.D. in organic chemistry from the University of California, Berkeley and an M.D. from the Medical College of Georgia. Dr. Scannon's experience in founding and building the Company is integral to the Company and its mission. His medical and scientific background, experience in all aspects of biopharmaceutical product discovery and development, board and government advisory experience and operational knowledge provide strategic guidance to the Company and the Board.

17.     Defendant William K. Bowes Jr. ("Bowes") has served as a member of the Company's board of directors since 1986, and he is chairman of the board's nominating and governance committee.  Upon information and belief, defendant Bowes is a citizen of California.  As of April 10, 2015, defendant Bowes owned 123,376 shares of Company common stock and earned compensation in 2014 for his services as director in the amount of $163,319.  The Proxy states about Bowes:

*William K. Bowes, Jr.* has been a director since February of 1986. He has been a General Partner of U.S. Venture Partners since 1981 and currently holds the position of Founding Partner. Mr. Bowes is a member of the Board or the Business Advisory Council of a number of academic initiatives at institutions such as Harvard University, Stanford University, the University of California, San Francisco and the University of California, Berkeley. Mr. Bowes provides exceptional knowledge and advice on capital markets and development strategies for biopharmaceutical companies.

18.     Defendant Peter Barton Hutt ("Hutt") has served as a member of the Company's board of directors since May of 2005, and he is a member of the board's nominating and governance committee.   Upon information and belief, defendant Hutt is a citizen of Virginia.  As of April 10, 2015, defendant Hutt owned 278,921 shares of Company common stock and earned compensation in 2014 for his services as director in the amount of $141,009.  The Proxy states about Hutt:

*Peter Barton Hutt*, former Chief Counsel for the Food and Drug Administration, became a director in May of 2005. Mr. Hutt is currently Senior Counsel to the Washington, D.C. law firm of Covington & Burling, specializing in food and drug law. Since 1994, he has taught a course on food and drug law at Harvard Law School and taught the same course at Stanford Law School in 1998. He is also a co-author of *Food and Drug Law: Cases and Materials.* Mr. Hutt is a member of the Institute of Medicine ("IOM") of the National Academy of Sciences ("NAS"). He recently served on the Working Group on Innovation in Drug Development and Evaluation of President Obama's Council of Advisors on Science and Technology. He has served on a wide variety of academic and advisory boards, including the Panel on the Administrative Restructuring of the National Institutes of Health ("NIH"). Formerly, he has served on the IOM Executive Committee, Advisory Committee to the Director of the NIH, the NAS Committee on Research Training in the Biomedical and Behavioral Sciences, and the National Committee to Review Current Procedures for Approval of New Drugs for Cancer and AIDS established by the President's Cancer Panel of the National Cancer Institute at the request of President George Bush. Mr. Hutt received his undergraduate degree from Yale University, and law degrees from Harvard University and New York University. Mr. Hutt

currently serves as a director of BIND Therapeutics, Inc., Concert Pharmaceuticals, DBV Technologies, Flex Pharma and Q Therapeutics. Previously, Mr. Hutt served as a director of Ista Pharmaceuticals from 2002 to 2012 and as a director of Celera from 2008-2011. Mr. Hutt's extensive and unique combination of legal, government, and industry experience is a key asset to the Board. He brings significant insight into the regulatory aspects of pharmaceutical development.

19.     Defendant Joseph M. Limber ("Limber") has served as a member of the Company's board of directors since December 2012, and he is a member of the board's compensation committee.  Upon information and belief, defendant Limber is a citizen of California.  As of April 10, 2015, defendant Limber owned 72,260 shares of Company common stock and earned compensation in 2014 for his services as director in the amount of $147,069.  The Proxy states about Limber:

*Joseph M. Limber* has been a director since December 12, 2012. Mr. Limber has served as President and Chief Executive Officer of Gradalis, Inc. since July 2013. Prior to that, Mr. Limber served as President and Chief Executive Officer of Prometheus Laboratories Inc., a subsidiary of Nestlé Health Science, since December 2003 and as a member of its Board of Directors since January 2004. From January 2003 to July 2003, Mr. Limber was a consultant and interim Chief Executive Officer for Deltagen, Inc., a provider of drug discovery tools and services to the biopharmaceutical industry. From April 1998 to December 2002, Mr. Limber was the President and Chief Executive Officer of ACLARA BioSciences, Inc. (now Monogram Biosciences, Inc.), a developer of assay technologies and lab-on-a-chip systems for life science research. From 1996 to 1998, he was the President and Chief Operating Officer of Praecis Pharmaceuticals, Inc. (acquired by GlaxoSmithKline plc), a biotechnology company focused on the discovery and development of pharmaceutical products. Prior to Praecis, Mr. Limber served as Executive Vice President of SEQUUS Pharmaceuticals, Inc. (acquired by Alza Corporation and now part of the Johnson & Johnson family of companies). He also held management positions in marketing and sales with Syntex Corporation (now F. Hoffmann-La Roche Ltd.) and with Ciba-Geigy Corporation (now Novartis AG). Mr. Limber holds a B.A. from Duquesne University. Mr. Limber has successfully developed markets for

specialty pharmaceutical products and managed the critical transition from research organization to commercial entity.

20.     Defendant W. Denman Van Ness ("Van Ness") has served as a member of the Company's board of directors since 1981.  In 2008, Van Ness was appointed lead independent director, and chairman of the board in 2011.  Defendant Van Ness serves on all three board committees:  the compensation committee, the audit committee and the nominating and governance committee.  Upon information and belief, defendant Van Ness is a citizen of California.  As of April 10, 2015, defendant Van Ness owned 161,039 shares of Company common stock and earned compensation in 2014 for his services as director in the amount of $213,489.  The Proxy states about Van Ness:

> *W. Denman Van Ness* has been a director since October of 1981 and was appointed Lead Independent Director in January of 2008 and Chairman of the Board in August of 2011. He is Chairman of Hidden Hill Advisors, a venture capital consulting firm. From April of 1996 through October of 1999, he was a Managing Director of CIBC Capital Partners, an international merchant banking organization. From 1986 to 1996, Mr. Van Ness was a General Partner of Olympic Venture Partners II and Rainier Venture Partners, venture capital funds, and from 1977 until 1985, he was a General Partner of the venture capital group at Hambrecht & Quist, the manager of several venture capital funds. Mr. Van Ness brings to the Board an extensive understanding of corporate development and background in assessing a wide range of corporate funding sources and partnering opportunities. His leadership skills, including past service on the boards of other companies, contribute to his role as Chairman of the Board.

21.     Defendant Timothy P. Walbert ("Walbert") has served as a member of the Company's board of directors since November of 2010.  Defendant Walbert is chairman of the audit committee of the board and a member of the nominating and

governance committee.  Upon information and belief, defendant Walbert is a citizen of California.  As of April 10, 2015, defendant Walbert owned 116,055 shares of Company common stock and earned compensation in 2014 for his services as director in the amount of $177,319.  The Proxy states about Walbert:

> *Timothy P. Walbert* has been a director since November of 2010. Mr. Walbert is Chairman, President and Chief Executive Officer of Horizon Pharma, a publicly traded biopharmaceutical company focused on developing and commercializing innovative medicines for unmet therapeutic needs in arthritis, pain and inflammatory diseases. From 2007 until 2009, Mr. Walbert was President, Chief Executive Officer and a director of IDM Pharma, Inc., a publicly traded oncology-focused biotechnology company. During his tenure, he drove the process of achieving European regulatory approval for MEPACT™ for the treatment of osteosarcoma, reorganized the company and its management team, and led the successful acquisition of IDM by Takeda America in June 2009. Prior to IDM, he was Executive Vice President of Commercial Operations for NeoPharm, Inc., a publicly traded biopharmaceutical company, where he oversaw global marketing, sales, reimbursement, manufacturing and business development. From 2001 to 2005, Mr. Walbert was with Abbott in positions of increasing responsibility, most recently as Vice President, International Marketing responsible for overseeing strategy for the global cardiovascular franchise. As Abbott's Divisional Vice President and General Manger for Immunology, Mr. Walbert created and had full P&L management of the global immunology franchise that led the global development and launch of HUMIRA ®, the multi-indication biologic which achieved over $10 billion in 2013 sales. Prior to his tenure at Abbott, Mr. Walbert was with Searle/Pharmacia where he held several marketing roles for CELEBREX ® in North America and coordinated international CELEBREX ® launch and post-launch activities in key international markets. Mr. Walbert currently serves on the Board of Directors of Raptor Pharmaceutical Corp., the Board of the Biotechnology Industry organization, or BIO, the Board of the Illinois Biotechnology Association, or iBIO, and the Board of the Greater Chicago Arthritis Foundation. Mr. Walbert holds a B.A. degree from Muhlenberg College, Allentown, PA. Mr. Walbert provides the Board with extensive, executive experience in publicly traded biotechnology companies with a focus on commercial operations, regulatory affairs, finance and strategic planning.

22.     Defendant Jack L. Wyszomierski ("Wyszomierski") has served as a member of the Company's board of directors since 2010.  Defendant Wyszomierski serves as chairman to the compensation committee as well as a member of the audit committee.  Upon information and belief, defendant Wyszomierski is a citizen of California.  As of April 10, 2015, defendant Wyszomierski owned 115,501 shares of Company common stock and earned compensation in 2014 for his services as director in the amount of $172,319.  The Proxy states about Wyszomierski:

> *Jack L. Wyszomierski* has been a director since August of 2010. From 2004 until his retirement in 2009, Mr. Wyszomierski was Executive Vice President and Chief Financial Officer of VWR International, LLC, a global laboratory supply, equipment and distribution business that serves the world's pharmaceutical and biotechnology companies, as well as industrial and governmental organizations. At Schering-Plough, a global health care company which had worldwide sales of over $8 billion in 2004, Mr. Wyszomierski held positions of increasing responsibility from 1982 to 2004 culminating in his appointment as Executive Vice President and Chief Financial Officer. Mr. Wyszomierski also serves on the Board of Directors of Athersys, Inc., Exelixis, Inc. and served on the Board of Directors of Unigene Laboratories, Inc. from 2012 to 2013. He holds an M.S. in Industrial Administration and a B.S. in Administration, Management Science and Economics from Carnegie Mellon University. Mr. Wyszomierski brings his considerable financial expertise to the Board, the Audit Committee, and the Compensation Committee.

23.     Defendants Varian, Rubin, Scannon, Bowes, Hutt, Limber, Van Ness, Walbert, and Wyszomierswki are herein referred to as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers, directors and/or fiduciaries of XOMA and because of their ability to control the business and corporate affairs of

XOMA, the Individual Defendants owed XOMA and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage XOMA in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of XOMA and its shareholders so as to benefit all shareholders equally.

25.     Each director and officer of the Company owes to XOMA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of XOMA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

27.     To discharge their duties, the officers and directors of XOMA were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

28.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual

Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of XOMA, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants has been ratified by the Individual Defendants who collectively comprised the XOMA's Board at all relevant times.

29.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NYSE, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information, and had a duty to correct such dissemination of inaccurate and untruthful information.   Accordingly, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

30.   To discharge their duties, the officers and directors of XOMA were required to exercise reasonable and prudent supervision over the management,

policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of XOMA were required to, among other things:

(a)   refrain from acting upon material inside corporate information to benefit themselves;

(b)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)   remain informed as to how XOMA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)   ensure that XOMA was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

31.     Each of the Individual Defendants further owed to XOMA and the shareholders the duty of loyalty requiring that each favor XOMA's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

32.     Moreover, the Individual Defendants, as an officer, director, and/or employee of the Company, were required to comply with the Company's Code of Ethics ("Code").  The Code of Ethics states that it "has a strong commitment to ethical and moral standards and to strictly complying with the laws and regulations that govern the conduct of our business worldwide.  We are committed to honesty and integrity and to building trust without employees, stockholders, collaborators, partners, clinical investigators, regulators and suppliers, as well as the scientific and other communities with which we interact."   Continuing, the Code states as follows:

[it] is intended to promote, among other things

(1) honest and ethical conduct, including ethical handling of actual or apparent conflicts of interest between personal and professional relationship;

(2) full, fair, accurate, timely and understandable disclosure in the Company's filings with the [SEC] and public communications;

(3) compliance with applicable laws, rules, regulations, and applicable industry codes;

(4) prompt internal reporting of violations of the Code; and

(5) accountability for adherence to the Code.

* * *

CONFLICT OF INTEREST/CORPORATE OPPORTUNITIES
Employees have an obligation to conduct business within guidelines that prohibit actual or potential conflicts of interest, and are expected to be familiar with and abide by the provisions regarding conflicts of interest in the Company's Policy Manual. Each Employee, whether regular, temporary, full-time, or part-time, has a duty to further the Company's objectives and to work on behalf of the Company's best interests. Potential conflicts of interest may arise from any situation in which an Employee's influence on a transaction or event involving a third party results in a personal gain to the Employee or a Family Member, by virtue of a gift, gratuity or other special consideration given to the Employee or Family Member by a third party, and may also arise in cases where an Employee or Family Member has a significant ownership interest in an outside firm with which the Company does business. Employees are cautioned to refrain from accepting any such gift, gratuity or special consideration or participating in a relationship which raises even the appearance of a conflict of interest without taking appropriate steps to ensure their compliance with the Company's policies. Employees are encouraged to direct any questions regarding such compliance to a member of the Legal Department or the CFO.

CORPORATE COMMUNICATIONS AND DISCLOSURE
As a company that is publicly-traded in the United States, the Company is subject to the disclosure requirements of the U.S. federal and state securities laws. These requirements can affect the content and timing of a variety of disclosures, including periodic and other filings with the U.S. Securities and Exchange Commission, press releases, presentations at investor and other conferences, and electronic communications on the Company's Website and elsewhere. To ensure compliance with these requirements across these various means of disclosure, the Company has established a Disclosure Committee. Any questions or concerns about these requirements, including any potential misstatements in or omissions from disclosure, should be raised with the appropriate person in the Legal Department designated by the Chief Financial Officer, or otherwise in accordance with the Complaint Submission Policy.

The Company strives to be consistent in its communications with others and is required under Regulation FD of the U.S. federal securities laws to ensure

that communications involving material information are made widely available and consistently. To achieve this goal, all contact with investors, analysts and members of the media should be handled by the appropriate investor relations representative or other appropriate personnel. Employees should direct any and all inquiries from investors, analysts or members of the media, including requests for information and interviews, to the appropriate investor relations representative. Employees who may be exposed to media contact, for example when attending conferences or making presentations, should be aware that the Company's standard corporate policy is not to comment on rumors or speculation regarding its activities or trading in its securities. All inquiries from regulatory authorities or government personnel other than representatives of the U.S. Food and Drug Administration ("FDA") or equivalent foreign authorities should be referred to a member of the Legal Department. Inquiries from the FDA or equivalent foreign authorities should be referred to the Regulatory Affairs Department.

REGULATORY COMPLIANCE

Many of the activities of the Company are subject to the U.S. Food, Drug and Cosmetic Act and the regulations of the FDA, as well as the statutory and regulatory equivalents in other jurisdictions around the world. Employees are required to consult with the Regulatory Affairs group and/or the Legal Department on all regulatory-sensitive matters.

In general, FDA and similar regulations govern the Company's interactions with healthcare providers and prohibit marketing or promotion of a pharmaceutical or biological product until both the product and the manufacture thereof have been approved. Certain regulatory filings must also be made before any testing in humans can begin and Employees must protect and ensure the privacy and security of patient information reviewed or collected during such testing. Approved products are subject to regulations governing labeling, promotional programs, product samples, adverse event reporting and product quality complaints. Strict compliance with all applicable regulations is essential to the Company's business.

It is the Company's policy to advertise and promote its products only through programs and materials that have been formally approved by the Company. All such programs and materials are reviewed by appropriate personnel to ensure compliance with applicable country, state, and local laws and regulations. Unauthorized alteration of product labels or literature may result in severe penalties against the responsible individual and the Company. No Employee should modify any portion of any product labeling or literature,

without prior authorization. Use of any unapproved promotional materials or advertisements is strictly prohibited.

33.     At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.

35.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, internal controls, and bonuses provided to employees; and (iii) to artificially inflate the Company's stock price.

36.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently to conceal material facts, misrepresent its financial results, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board,

each of the Individual Defendants who are directors of XOMA was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

37.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to, and furtherance of, the wrongdoing.

38.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of XOMA, and was at all times acting within the course and scope of such agency.

## DEFENDANTS' MISCONDUCT

39.    As of November 2014, the Individual Defendants had led Company investors into believing that gevokiszumab would signal commercial success:  first, the Phase 3 EYEGUARD-B trial would be successful, and second FDA approval would be obtained in response to its BLA.

40.    On November 6, 2014 the beginning of the Class Period, the Company issued a press release announcing its results for the quarter ended September 30, 2014. The press release stated in relevant part:

**Recent Highlights:**

Opened EYEGUARD-US, a clinical trial conducted at centers in the United States to study gevokizumab in patients with active or controlled Behçet's disease uveitis as part of a broader strategy to file the first Biologics Licensing Application (BLA) for gevokizumab in Behçet's disease uveitis.

* * *

"Our clinical development teams have been very productive in the past few months, opening both the EYEGUARD-US clinical study and the gevokizumab Phase 3 pyoderma gangrenosum study, while driving enrollment in our EYEGUARD-A and -C trials. They also exceeded our expectations with the launch of a Phase 1 study for XOMA 358, a novel monoclonal antibody discovered and developed at XOMA," stated John Varian, Chief Executive Officer of XOMA. "The EYEGUARD program, particularly the studies in Behçet's disease uveitis, puts us on the pathway to submit XOMA's first Biologics Licensing Application for gevokizumab, approval of which allows us to achieve our goal of transforming into a commercial organization marketing our products to the U.S. specialist prescriber.

41.    It was during this conference call ("3Q14 Earnings Call") that defendants Varian and Rubin commenced their scheme to misrepresent the prospects of the clinical trial.  After the close of the market, Defendant Varian stated, in relevant part:

As we've said though, we are not waiting. We continue to move forward with the activities that will allow us to pursue Behçet's disease uveitis as our first BLA submission for gevokizumab. Specifically, we are preparing analyses of the previously generated gevokizumab Phase 2 data in Behçet's uveitis patients, such that it can be supportive of the EYEGUARD-B pivotal study.

We also initiated the supplemental EYEGUARD-U.S. study in September. Paul and I will discuss the study design and potential role for you today. Once we have the EYEGUARD-B data results in hand, assuming of course that they are positive, we will take the steps to request a pre-BLA meeting with FDA.  Today, we'd like to provide more clarity about the EYEGUARD-B study and Servier's progress with it. In May, we reported that Servier had

informed that 75% of the number of pre-set targeted exacerbations that allow the unmasking of the data had occurred, and that Servier predicted the final event would happen in June.

I have asked Paul to spend a good portion of his comments today discussing our detailed learnings since we spoke with you last. Our learnings are encouraging to our ultimate goal and should give you a good understanding of how we got from where we were back in May to where we are today. We're getting closer to having the data, but as I said, we're not waiting. Our entire team is running flat-out to create additional opportunities for success.

* * *

We've chosen a Behçet's disease uveitis first strategies specifically because it allows us to take our fate into our own hands, once we have the EYEGUARD-B data from Servier. If we can gain approval in Behçet's disease uveitis, we believe we only need a positive result from either EYEGUARD-A or EYEGUARD-C to seek the broader, but still orphan indication of noninfectious uveitis.

* * *

Drug development is never as clear cut as one expects or hopes. There are many, many variables and dynamics that change rapidly and must be factored into your decision making. You have to have confidence that you will succeed in the end. We are moving gevokizumab in the right direction and we're working hard to ensure we have the multiple opportunities to succeed.

42.     Following up on Defendant Varian's statements, Defendant Rubin stated the following at the 3Q14 Earnings Call concerning the raw data from EYEGUARD-B trial:

It is encouraging to see that there are still a significant number of ongoing patients in the trial, who have not experienced an exacerbation or have been rescued early. Many of them have been in the trial for over six months without issues, long after the steroid tapering has been completed.

43.     On March 11, 2015, the Company issued a press release announcing its results for the quarter and full-year ended December 31, 2014, wherein the

Individual Defendants continued their misrepresentations.  The press release stated in relevant part:

> "The fourth quarter was focused on driving enrollment in all five of our gevokizumab Phase 3 clinical trials, completing our first XOMA 358 clinical study, and putting the Company on a strong financial footing to allow us to achieve our goal of transforming XOMA into a commercial organization marketing our products to the U.S. specialist prescriber," stated John Varian, Chief Executive Officer of XOMA. "Our clinical and regulatory teams are compiling the documentation required to submit a Biologics Licensing Application, in anticipation of positive EYEGUARD-B clinical results and FDA interactions. By investing significant time now, we are doing all we can to expedite the process of requesting a pre-BLA meeting with FDA if we obtain positive primary endpoint results.

> "With the encouraging proof-of-concept results in Scleritis, we have identified another potential indication for gevokizumab, and with the successful completion of the XOMA 358 Phase 1 study, we have demonstrated our ability to expand our product pipeline with another internally discovered compound that may lead to therapies for people who are living with conditions that are in clear need of new treatment options," Mr. Varian concluded.

44.    During the Company's fourth quarter 2014 earnings call held on March 11, 2015 ("4Q14 Earnings Call"), after the close of the market, Defendant Varian looked to intimate that the clinical data was reflecting the Company's objectives:

> [W]e are not waiting for EYEGUARD-B results. We are taking the steps necessary to allow Behcet disease uveitis to be our first indication for gevokizumab.  If  EYEGUARD-B is positive, we will request a pre-BLA meeting with the FDA to review the study. Our pre-BLA package will also include the two Phase II studies Servier and we previously conducted inpatients with Behcet disease uveitis, as well as the entire safety database we have compiled for gevokizumab.

* * *

As we've said on many occasions, gevokizumab is our first, second, and third priority. In December 2012, we announced active, noninfectious anterior scleritis as one of the indications in our gevokizumab proof of concept program.

Scleritis is the inflammation of the sclera, or fibrous white membrane surrounding the eyeball, excluding the cornea. Scleritis is a chronic, painful inflammatory disease associated with systemic immune disorders including polyangiitis, which includes microscopic polyangiitis and giant cell arteritis.

Scleritis can lead to vision loss or blindness if left untreated. Scleritis is a rare disease with an estimated prevalence of approximately 18,000 patients in the U.S. The National Eye Institute or NEI conducted the open label proof of concept trial of gevokizumab in scleritis under Dr. [Nita Shen's] leadership.

The NEI has completed the study by enrolling eight patients with active, noninfectious anterior scleritis. The study objectives were to evaluate the safety and possible efficacy of gevokizumab in patients with active scleral inflammation at baseline.

Although the study is still ongoing, six of the eight study participants had a positive response in the first 16 weeks of gevokizumab treatment based on a standardized scale. We are very excited by these results, an indication which fits well with our strategic commercial focus for gevokizumab and our other pipeline programs. We will be working with NEI to design a possible multicenter controlled trial in this difficult to treat condition.

\* \* \*

We are all looking forward to the recurrence of the final ocular exacerbation in the EYEGUARD-B study. It will happen when it happens and we'll let you know when the countdown to data analysis has started, but we are not waiting.  We are urgently taking steps to execute on our Behcet's first strategy.

We and Servier can see the light at the end of the tunnel for EYEGUARDs A and C. We believe we need only one of these two studies, EYEGUARD-A or EYEGUARD-C, to be positive in order to submit a supplemental BLA with the FDA for the broader NIU indication providing we have approval from the FDA in Behcet disease uveitis.

* * *

We do see [with regard to the EYEGUARD-B study] that if patients get to a certain point in time, the rate of exacerbation goes to virtually nothing. So when  Servier sized the study and it had a predicted rate of exacerbations, they assumed every patient would exacerbate at some point in time, including gevokizumab patients.

So when that line was drawn and the exacerbations were calculated, how many patients needed to come in, there was an assumption that all patients would exacerbate but hopefully the gevokizumab patients would be later exacerbators. What we've seen, and we've said this, is that there is a group of patients that in this study who've gone a very long time, and on average more than nine months and even more than that, who have not exacerbated.

We know that all the patients that came into the study had to have had an exacerbation in the previous four months, and they had to have at least one more, and they had on average much more than one more, or more than one more, in the previous 14 months, or within the total 18 month period.

So these patients were exacerbating as they came into the study. We are seeing a group of patients who have gone a very long time and not having exacerbated. So that has thrown off our calculations somewhat, of when exacerbations would happen and when we would get to this point in time.

45.    Following up on Defendant Varian's statements, Defendant Rubin stated the following at the 4Q14 Earnings Call:

No, that's exactly right. As you know, the study is a [unintelligible] withdrawal trial, and historically, and this is kind of evidenced by our first study that we did in Turkish patients, when patients are not on an active therapy, they exacerbate relatively quickly, that they fall below a therapeutic level of drug, and that's what we saw in our Turkish patients. So in retrospect, we could have probably predicted that the majority of the exacerbations would have occurred in the first three months.

I think we kind of looked at it as linear. It's clearly not linear. There's a large number at the beginning, which is exactly, when you understand the disease and what we're doing to these patients, makes complete sense. What we didn't know is that that rate would then kind of plateau with time. And that's

exactly what we're seeing. So although we don't know who's on active and who's on placebo, if you had an active drug, this is sort of the pattern you would expect to see.

46.    On May 7, 2015, the Company issued a press release announcing its results for first quarter 2015, ended March 31, 2015. The press release stated in relevant part:

> During the first quarter of this year, we made significant progress toward achieving our goal of becoming a commercial organization," said John Varian, Chief   Executive Officer of XOMA. "Servier is just one ocular exacerbation away from being able to close the EYEGUARD™-B study database and expects to reach the targeted ocular exacerbation event any day. If the study results are positive, we will perform an analysis of the full EYEGUARD-B dataset and plan to quickly request a pre-Biologics License Application meeting with the U.S. Food and Drug Administration."

* * *

**Recent Achievements**

> One ocular exacerbation away from reaching the targeted number of exacerbations in the pivotal Phase 3 EYEGUARD-B clinical study of gevokizumab in Behçet's disease uveitis.

47.    During the Company's first quarter 2015 earnings call held on May 6, 2015 ("1Q15 Earnings Call"), after the close of the market, defendant Varian acknowledged that the Company had "anticipated" being in a "self-imposed quiet period."    However, he continued to make materially false and misleading statements that led the market to believe that concerning the gevokizumab Phase 3 EYEGUARD-B study would be successful.  At the 1Q15 Earnings Call, Defendant Varian stated, in relevant part:

> We are one exacerbation away from being able to close the EYEGUARD-B

study database. That's right. One more patient with Behcet's disease uveitis needs to exacerbate.

We had our second to last exacerbation just over a month ago, and the recent exacerbations have occurred about once a month. So the first thing I've done every morning for the last month is check my phone and e-mails, expecting and hoping for the news. It looks like I'll be doing that again tomorrow morning.

We know we can expect the final exacerbation any time, since we know that in clinical trials exacerbations most frequently occur in patients during the first 90 days. Since Servier has enrolled 12 patients in EYEGUARD-B since the beginning of the year, and since spring is settling in across the northern hemisphere, we should be getting to that final targeted exacerbation any day now.

In preparation, Servier has created and provided us with a detailed timeline of events from database lock, until we'll have preliminary topline data to announce. Based on this schedule, we are on track to be able to announce the primary endpoint results.

\* \* \*

Now, since we're right at the finish line, I am going to give you some additional color. Servier has performed a Herculean task to bring this trial to this important moment. While I can't be exact, I think it's important to give you some general background to reflect how hard they've worked on the study, which they've consistently shown is extremely important to them.

EYEGUARD-B had an original target enrollment of more than 50, but less than 100 patients, which Servier hit last June. The study is a double-masked one-to-one 60 milligrams of gevokizumab to placebo randomized trial.

The targeted number of exacerbations we've been chasing to allow the unblinding of the study is approximately one-half the number of patients originally targeted for enrollment. So while we can't say the exact number, I hope you can appreciate that we were a long way down the road, when we were a handful away, and particularly now just one.

In the early months of the study the exacerbation rate was running at Servier's expected rate. What neither our partner nor we expected was that once patients progressed through the early months of the study without

Verified Shareholder Derivative Complaint

exacerbating, we would see a virtual cessation in exacerbations.

Since Servier anticipated patients would continue to exacerbate in later months, it has taken more time to reach the preset exacerbation target than anyone would have predicted. Once we realized this was happening, in order to achieve the targeted number of events, Servier continued to enroll patients in EYEGAURD-B on the original targeted number.

As of today, they have enrolled approximately 20 additional patients. The majority of this effort occurred since last December and has enabled us to reach the doorstep we stand at today. We believe the increase in patient numbers and extended length of time we've experienced in EYEGAURD-B helps generate important additional information, since long-term control of Behcet's disease uveitis is so crucial.

Based on our assumptions, the study has 90 percent power to detect the difference between treatment groups. The study's endpoint is the time to first exacerbation between the gevokizumab and placebo arms. As I said, if the database closing goes as planned, we'll be announcing the results approximately seven weeks after we report that final exacerbation has occurred.

48.     On May 28, 2015, the Company issued a press release announcing that the gevokizumab Phase 3 EYEGUARD-B study, the same study that was the subject of the negative news on July 22, 2015, reached its target exacerbation event as specified in the study design.  The positive news spurred XOMA's share price to rise nearly 8% on the day of the news.  The press release stated in relevant part:

BERKELEY, Calif., May 28, 2015 (GLOBE NEWSWIRE) – XOMA Corporation (Nasdaq:XOMA), a leader in the discovery and development of therapeutic antibodies, today announced that the gevokizumab Phase 3 EYEGUARD-B study, sponsored by its development partner Servier, reached its target exacerbation event as specified in the study design. The objective of the first part of this study is to demonstrate the superiority of gevokizumab, as compared to placebo, on top of the current standard of care (immunosuppressant therapy and oral corticosteroids) in reducing the risk of Behçet's disease uveitis exacerbations and to assess the safety of

gevokizumab.

Servier now will begin the process of closing the clinical database and analyzing the data from this part of the study. Servier has provided a detailed schedule of the activities it will undertake to allow the locking of the database. The primary endpoint result is expected in approximately seven weeks. The trial is ongoing and remains double-masked for the extension period of the study.

The Phase 3 EYEGUARD-B study (A randomisEd, double-masked, placebocontrolled study of the Efficacy of GevokizUmAb in the treatment of patientswith Behçet's Disease uveitis) was designed to enroll patients with a history of Behçet's disease uveitis with ocular involvement of the posterior segment who have experienced a recent ocular exacerbation that was treated successfully with high doses of corticosteroids. Patients were randomized to either a 60 mg dose of gevokizumab or placebo administered subcutaneously once monthly on top of their current immunosuppressive and corticosteroid therapies. The primary endpoint is the time to first acute ocular exacerbation.

**The Truth Emerges**

49.    On July 22, 2015, prior to the opening of the market, the Company issued a press release announcing that its pivotal Phase 3 clinical study evaluating gevokizumab for the treatment of patients with Behçet's disease uveitis outside the United States, EYEGUARD-B, missed the primary endpoint of time to first acute ocular exacerbation.   Not only was gevokizumab's viability as a treatment for Behçet's disease uveitis not an option, but the BLA was never in the cards.   The press release stated in relevant part:

BERKELEY, Calif., July 22, 2015 (GLOBE NEWSWIRE) – XOMA Corporation (Nasdaq:XOMA), a leader in the discovery and development of therapeutic antibodies, today announced the Phase 3 EYEGUARD-B study of gevokizumab in patients with Behçet's disease uveitis, run by its partner Servier, an independent French pharmaceutical research company driven by the pursuit of innovative drugs, did not meet the primary endpoint of time to

first acute ocular exacerbation.

"Although the study did not achieve its main objective, we did see signals of drug activity such as preserved visual acuity, less severe ocular exacerbations and a reduced incidence of reported macular edema in patients treated with gevokizumab," said Paul Rubin MD, Senior Vice President Research and Development and Chief Medical Officer. "We will continue to work closely with our partner, Servier, and uveitis experts to conduct a thorough analysis of the data to fully understand gevokizumab's impact on several clinically relevant endpoints."

"The initial observations seen in the secondary endpoints are clinically important and meaningful to both clinicians and Behçet's disease uveitis patients," stated Dr. Ilknur Tugal-Tutkun, international coordinator for the EYEGUARD-B study and Professor of Ophthalmology, Head, Ocular Immunology and Uveitis Service at Istanbul University, Istanbul Faculty of Medicine, Department of Ophthalmology. "We look forward to learning more."

"In recent years, our public focus has been on gevokizumab. However, during that time, we have significantly advanced other assets in our pipeline including XOMA 358, for which we completed a positive Phase 1 study showing it is active in down-regulating the insulin receptor and shows potential in treating patients who experience endogenous over-production of insulin, and XOMA 089, our late preclinical anti-TGFβ monoclonal antibody with potential in immuno-oncology and fibrosis," said John Varian, Chief Executive Officer of XOMA. "We will focus our efforts on creating value with these pipeline assets and reduce expenses where appropriate. While we continue to evaluate the data from EYEGUARD-B, the EYEGUARD-A and C studies, in the broader range of non-infectious uveitis, are still recruiting."

Gevokizumab appeared to be well tolerated in the trial. Adverse events were comparable between gevokizumab and placebo treated groups.

* * *

EYEGUARD-B Study Design

The objective of the Phase 3 EYEGUARD-B study (A randomised, doublemasked, placebo-controlled studY of the Efficacy of GevokizUmAb in the treatment of patients with Behçet's Disease uveitis) was to demonstrate

the superiority of gevokizumab, compared with placebo, on top of the current standard of care in reducing the risk of Behçet's disease uveitis exacerbations and to assess the safety of gevokizumab. The study was designed to enroll patients with a history of Behçet's disease uveitis with ocular involvement of the posterior segment who had experienced a recent ocular exacerbation that was treated successfully with high doses of corticosteroids.

The trial enrolled a total of 83 patients in the core part of the study (40 on gevokizumab and 43 on placebo). Patients were randomized to either a 60 mg dose of gevokizumab or placebo administered subcutaneously once monthly on top of their current immunosuppressive and corticosteroid therapies. They were randomized when they reached the step of 20 mg/day equivalent oral prednisone and continued a standardized tapering regimen until they reached 5 mg/day during double-masked treatment.

The primary endpoint was the time to first acute ocular exacerbation. Secondary endpoints included total number of exacerbations, best corrected visual acuity, vitreous haze, retinal lesions, fundus assessments and macular edema.

50.    As the result of this news, the share price of the Company's common stock plunged $3.48 in premarket trading, from a closing share price of $4.39 on July 21, 2015 to open at $0.91 per share on July 22, 2015, or over 79%, on extremely heavy trading volume.

51.    From November 2014 to July 2015, the Individual Defendants knew or should have known that:  (1) the EYEGUARD-B trial would not meet its primary endpoint; (2) if the EYEGUARD-B trial hit its final exacerbation, it would nonetheless not impact the prospect of the BLA submission; and (3) the BLA submission for gevokizumab would not take place; and (4) the Individual Defendants' representations to the contrary were improper.

## DAMAGES TO XOMA

52.     As a direct and proximate result of the Individual Defendants' conduct, XOMA has expended and will continue to expend significant sums of money.

53.     Such expenditures include, but are not limited to, legal fees associated with the class action lawsuit filed against the Company and certain Individual Defendants for violations of the federal securities laws, and amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations.

54.     Such costs include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

55.     As a direct and proximate result of the Individual Defendants' conduct, XOMA has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misrepresentations made by the Individual Defendants and caused to be made by the Company by the Individual Defendants.

## <u>DERIVATIVE ALLEGATIONS</u>

56.     Plaintiff brings this action derivatively and for the benefit of XOMA to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of XOMA, gross mismanagement, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof.

57.     XOMA is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

58.     Plaintiff is, and at all times during the Relevant Period has been, a XOMA shareholder.  Plaintiff will adequately and fairly represent the interests of XOMA in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

59.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

60.     A pre-suit demand on the Board of XOMA is futile and, therefore, excused.  At the time of filing of this action, the Board consisted of the following eight Individual Defendants: Varian, Scannon, Bowes, Hutt, Limber, Van Ness, Walbert, and Wyszomierswki (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to four of the eight directors that were on the Board at the time this action was commenced.

61.     Defendant Varian acted as the Company's chief executive officer and chairman, and thus, is a non-independent director.  Varian received over $3 million in compensation in 2014, including stock options valued at $1.10 million.  From November 13, 2014 to July 15, 2015, defendant Varian sold $495,396.47 worth of

Company common stock on inside material information at a time when he was the most responsible for the Company's fraud, which evidences his motive and opportunity to engage in the fraud and his vested interest in causing the Company stock price to be as high as possible. As the maker of the false and misleading statements of material fact as alleged herein, defendant Varian breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Varian knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Additionally, defendant Varian is a defendant in the federal securities fraud class action lawsuits. Thus, Varian faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

62. Defendant Scannon acted as the Company's Executive Vice President and Chief Scientific Officer since February 2011, and is also a non-independent director. Scannon received $1,143,535 in compensation in 2014, including stock options valued at $397,884. From November 13, 2014 to March 18, 2015, defendant Scannon disposed of $129,723.71 worth of XOMA common stock, which evidences his motive and opportunity to engage in the fraud and his vested interest in causing the Company stock price to be as high as possible. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Scannon knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Thus, as a non-independent

director, and as an officer who was directly responsible for the Company's fraud, he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

63.   Defendant Van Ness has served as a Company member of the Company's board of directors since 1981.  As of April 10, 2015, defendant Van Ness owned 161,039 shares of Company common stock and earned compensation in 2014 for his services as director in the amount of $213,489.  In 2008, Van Ness was appointed lead independent director, and chairman of the board in 2011 and serves on all three of the Company's board committees.  Significantly, as a member of the audit committee, defendant Van Ness is charged with reviewing the Company's accounting practices and systems of internal accounting controls as well as the objectivity of its financial reporting.  Furthermore, Van Ness, along with the other members of the committee, is answerable to the Company and the shareholders to review to review XOMA's audited consolidated financial statements and discuss with management the financial results for the fiscal years during which he sits on the committee.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Van Ness knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  Thus, as Van Ness is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

64.     Defendant Walbert has served as a member of the Company's board of directors since November of 2010.  As of April 10, 2015, defendant Walbert owned 116,055 shares of Company common stock and earned compensation in 2014 for his services as director in the amount of $177,319.  Defendant Walbert is chairman of the audit committee of the board and a member of the nominating and governance committee.  As chair of the audit committee, defendant Walbert is charged with reviewing the Company's accounting practices and systems of internal accounting controls as well as the objectivity of its financial reporting.  Furthermore, Walbert, along with the other members of the committee, is answerable to the Company and the shareholders to review XOMA's audited consolidated financial statements and discuss with management the financial results for the fiscal years during which he sits on the committee.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Walbert knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  Thus, as Walbert is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

65.     Defendant Wyszomierski has served as a member of the Company's board of directors since 2010.  As of April 10, 2015, defendant Wyszomierski owned 115,501 shares of Company common stock and earned compensation in 2014 for his services as director in the amount of $172,319.     Defendant

Wyszomierski serves as chairman to the compensation committee as well as a member of the audit committee. Significantly, as a member of the audit committee, defendant Wyszomierski is charged with reviewing the Company's accounting practices and systems of internal accounting controls as well as the objectivity of its financial reporting. Furthermore, Wyszomierski, along with the other members of the committee, is answerable to the Company and the shareholders to review to review XOMA's audited consolidated financial statements and discuss with management the financial results for the fiscal years during which he sits on the committee. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Wyszomierski knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it. Thus, as Wyszomierski is not a disinterested or independent director, and as he faces a substantial likelihood of liability, demand upon him is futile and, therefore, excused.

66.    Demand is excused as to all of these Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

67.    The Directors, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics is applicable to all employees, including the

Company's officers and directors. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics required the Directors to also adhere to XOMA's standards of business conduct.  The Directors did not comply with the requirements of the Code of Ethics.  The Directors violated the Code of Ethics by making and/or facilitating the false misrepresentations set forth, by failing to correct those misrepresentations, and by engaging in misconduct.  Because these Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

68.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendant Varian, who made and/or was responsible for causing the Company's misconduct and for making the false and misleading statements of material fact alleged herein and for failing to correct those false and misleading statements.

69.    Members of the Board have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Board from adequately monitoring the Company's operations and calling into question the Individual Defendants' conduct.  Thus, any demand on these Directors would be futile.

70.     XOMA has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for XOMA any part of the damages XOMA suffered and will continue to suffer thereby.  Thus, any demand on these Directors would be futile.

71.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

72.     The acts complained of herein constitute violations of fiduciary duties owed by XOMA's officers and directors and these acts are incapable of ratification.

73.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their

protection with corporate funds, i.e., monies belonging to the stockholders of XOMA.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of XOMA, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

74.     If there is no directors' and officers' liability insurance, then the Directors will not cause XOMA to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

75.     Thus, for the reasons set forth above, all of the Directors, and, if not all of them, certainly a majority of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

76.     Overall, the Company will most likely expend millions of dollars in defending the securities fraud class action and internal investigations.  It may be

liable for millions of dollars in damages if it loses or settles the related securities fraud class action. Moreover, the Company's reputation has been severely damaged. The Company has also wasted a substantial amount of money in compensating the Individual Defendants as directors and officers. Its market capitalization has been severely diminished and its prospect of raising equity in the future is questionable. All of this substantial damage stems proximately from the Individual Defendants' conscious and willful breaches of their fiduciary duties, abuse of control, and other malfeasance.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

77. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

78. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of XOMA's business and affairs.

79. Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

80. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly,

or negligently breached or disregarded their fiduciary duties to protect the rights and interests of XOMA.

81.     In breach of their fiduciary duties owed to XOMA, the Individual willfully engaged in misconduct and participated in misrepresentation of the Company's business operations and prospects and failed to correct the Company's public statements, rendering them personally liable to the Company for breaching their fiduciary duties.

82.     The Individual Defendants had actual or constructive knowledge that they had engaged in misconduct and caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such material misrepresentations and omissions were made, and were subsequently not corrected, knowingly or recklessly and for the purpose and effect of artificially inflating the price of XOMA's securities.

83.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

84.     Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for

the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them, and failed to correct such misrepresentations and omissions.  Such material misrepresentations and/or omissions were caused to be made knowingly or recklessly.  Such failure to correct the material misrepresentations and/or omissions was caused to be done knowingly or recklessly.

85.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, XOMA has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## SECOND CLAIM

### Against Individual Defendants for Abuse of Control

86.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

87.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence XOMA, for which they are legally responsible.

88.   As a direct and proximate result of the Individual Defendants' abuse of control, XOMA has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, XOMA has sustained and continues to sustain

significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## THIRD CLAIM

### Against Individual Defendants for Gross Mismanagement

89.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

90.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of XOMA in a manner consistent with the operations of a publicly-held corporation.

91.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, XOMA has sustained and will continue to sustain significant damages.

92.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

93.    Plaintiff, on behalf of XOMA, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

94.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

95.    By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, XOMA.

96.    The Individual Defendants either received bonuses, stock options, or similar compensation from XOMA that was tied to the financial performance or artificially inflated valuation of XOMA, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, and/or benefitted financially from their lucrative insider sales.

97.    Plaintiff, as a shareholder and a representative of XOMA, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, and all profits obtained through insider sales, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of XOMA, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to XOMA;

(c)     Determining and awarding to XOMA the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing XOMA and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect XOMA and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

(i) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii) a provision to permit the shareholders of XOMA to nominate at least four candidates for election to the Board; and

(iii) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding XOMA restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other an1d further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  November 24, 2015              Respectfully submitted,

**LAW OFFICE OF ADAM R. BERNSTEIN**

By: /s Adam Bernstein
Adam Bernstein SBN 132982
198 Coffeeberry Dr.
San Jose, CA, 95123
Telephone: (408) 960-6511
Facsimile: (408) 613-2489
Email: bernsteinlaw@earthlink.net

*-and-*

Timothy W. Brown
**THE BROWN LAW FIRM, P.C.**
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

_____                *Counsel for Plaintiff*

## VERIFICATION

I, Jeff Csoka, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of November, 2015.

JEFF CSOKA